IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COX COMMUNICATIONS, INC.,
a Delaware corporation,

    Plaintiff,

      v.

NATIONAL Union Fire Insurance Co.
of Pittsburgh, PA, a Pennsylvania
corporation,

    Defendant.

CIVIL ACTION FILE
NO. 1:09-CV-410-TWT

ORDER

     This is a breach of contract action arising out of an insurance coverage dispute.

It is before the Court on the Defendant National Union Fire Insurance Company of

Pittsburgh, PA's Motion for Summary Judgment [Doc. 26] and Request for Oral

Argument on Its Motion for Summary Judgment [Doc. 48].  For the reasons set forth

below, the Court DENIES both motions.

I. Background

     Cox Communications, Inc. is a large telecommunications company that

provides television, internet, and phone services in the United States.  Cox

Communications is a wholly-owned subsidiary of Cox Enterprises, Inc.  In the mid

1990s, Cox Enterprises began purchasing directors and officers liability insurance from National Union Fire Insurance Company of Pittsburgh, PA. This insurance covered Cox Enterprises, its subsidiaries, and the executives of Cox Enterprises and its subsidiaries. (Compl., Ex. A, § 2(n)-(o).) It provided three types of coverage: executive liability insurance, outside entity executive liability insurance, and organization insurance. The executive liability insurance covered losses of any executive for legal action against the executive for conduct on behalf of Cox Enterprises or its subsidiaries. The outside entity executive liability insurance covered losses of any executive for legal action against the executive for conduct (such as serving on the board of directors) on behalf of certain outside entities. The organization insurance covered losses of Cox Enterprises or its subsidiaries for their indemnification of any executive for losses otherwise covered under the executive or outside entity liability insurance.

At Home Corporation was an outside entity listed under Cox Enterprises's directors and officers liability insurance. At Home provided high speed internet service. In June 1996, At Home entered into service distribution agreements with Cox Communications, Tele-Communications, and Comcast. Cox Communications and Comcast soon purchased significant shares of At Home stock. These investments gave Cox Communications and Comcast each the right to place one person on At

Home's board of directors. In August 1996, Cox Communications selected David Woodrow, one of its executives, to serve on At Home's board of directors.

Within a few years, At Home sought new service distribution agreements and reforms to At Home's corporate structure. At Home's stock prices had been declining, and At Home believed new agreements would improve its financial condition. In March 2000, representatives of At Home, Cox Communications, Comcast, and AT&T, Inc. (which had purchased Tele-Communications) negotiated several agreements to address these issues. At Home's board of directors, including Woodrow, unanimously voted in favor of the March 2000 Agreements. As part of these agreements, AT&T granted Cox Communications and Comcast the option to sell their At Home stock to AT&T, the right to purchase certain At Home assets, and relief from their obligation to distribute At Home internet service. (Def.'s Br. in Supp. of Mot. for Summ. J., at 7-8.) In exchange, Cox Communications and Comcast gave up their rights regarding selection of At Home's board of directors. (Id.)

In May 2000, shareholders filed two actions in the Superior Court of San Mateo County, California against Woodrow, Cox Communications, Comcast, AT&T, and other defendants. See Schaffer v. At Home Corp., Case No. 413094 (Super. Ct. Cal. May 26, 2000); Yourman v. At Home Corp., Case No. 413115 (Super. Ct. Cal. May 30, 2000). The San Mateo Actions alleged that the defendants breached their

fiduciary duties to At Home by negotiating and approving the March 2000 Agreements.[1] Like Cox Communications, some of the defendants in the San Mateo Actions also had directors and officers liability insurance with National Union. By August 2000, At Home, Comcast, and AT&T each had reported the San Mateo Actions to National Union for coverage. Cox Communications, however, either did not report or did not timely report the San Mateo Actions. (Def.'s Br. in Supp. of Mot. for Summ. J., at 9-10); (Pl.'s Opp'n to Def.'s Mot. for Summ. J., at 12.)

Meanwhile, the March 2000 Agreements failed to improve At Home's financial condition. Eventually, At Home's financial obligations became too much for it to handle. In September 2001, At Home filed for bankruptcy protection in the Bankruptcy Court for the Northern District of California. It is no longer a going concern. The Bankruptcy Court appointed an Official Committee of Unsecured Bondholders to prosecute any action arising out of the March 2000 Agreements. In June 2002, the Bondholders Committee filed a motion in the Bankruptcy Court requesting that the court enjoin the San Mateo Actions. It argued that the San Mateo Actions asserted claims that belonged to the bankruptcy estate. The Bankruptcy Court

---

[1]Shareholders filed a third action in September 2001. See Ward v. At Home Corp., Case No. 418233 (Super. Ct. Cal. Sept. 6, 2001). The Superior Court of San Mateo County later consolidated all three actions into one.

agreed. On September 10, 2002, it enjoined the prosecution of the San Mateo Actions. (Ney Decl., Ex. 7.)

With the injunction in place, the Bondholders Committee filed its own action in the District Court for the District of Delaware against Woodrow, Cox Communications, Comcast, and other defendants. See At Home Corp. v. Cox Commc'ns, Inc., 1:02-CV-1486 (D. Del. Sept. 24, 2002). The Bondholders Action alleged that the defendants breached their fiduciary duties to At Home by negotiating and approving the March 2000 Agreements and that the defendants violated federal securities laws.[2] Cox Communications reported the Bondholders Action to National Union for coverage. National Union denied coverage, asserting that the losses do not meet the conditions for coverage and are subject to exclusions. The Defendants in the Bondholders Action ultimately settled. As part of the settlement, Cox Communications paid $40 million on behalf of itself and Woodrow. Cox Communications also incurred significant legal fees.

---

[2]In September 2003, the District Court for the District of Delaware transferred the Bondholder Action to the District Court for the Southern District of New York. At Home Corp. v. Cox Commc'ns, Inc., 1:02-CV-1486 (D. Del. Sept. 30, 2003). In August 2004, that court dismissed the federal securities claims with prejudice and dismissed the breach of fiduciary duty claims without prejudice. At Home Corp. v. Cox Commc'ns, Inc., 340 F. Supp. 2d 404, 404 (S.D.N.Y. 2004). In September 2004, the Bondholders Committee re-filed the breach of fiduciary duty claims in the Delaware Court of Chancery. Williamson v. Cox Commc'ns, Inc., C.A. No. 1663-N (Del. Ch. Sept. 22, 2004).

Not long after the Bondholders Committee filed their action, shareholders again filed their own actions. In July 2003, and in June 2005, shareholders filed class actions against Woodrow, Cox Communications, Comcast, AT&T, and other defendants. See James v. AT&T Corp., 1:03-CV-4985 (S.D.N.Y. July 3, 2003); Ventura v. AT&T Corp., 1:05-CV-5718 (S.D.N.Y. June 21, 2005). The Shareholders Actions alleged that the defendants violated federal securities laws by making false and misleading statements about the March 2000 Agreements. Cox Communications reported the Shareholders Actions to National Union for coverage. National Union has also denied coverage, asserting that the losses do not meet the conditions for coverage and are subject to exclusions. Cox Communications ultimately paid $13,000 in settlement and incurred $200,000 in legal fees for these actions.

Cox Communications filed this action against National Union, alleging breach of contract and seeking recovery of its policy limit of $30 million. The Defendant moves for summary judgment as to the Plaintiff's claims involving the Bondholders Action. The Defendant says that losses for the Bondholders Action are not covered under the policy. It says that those losses do not satisfy the claims first made condition and are also subject to the prior notice exclusion and the outside entity exclusion. The Defendant does not, however, move for summary judgment on the Plaintiff's claims involving the Shareholder Actions.

## II.  Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).  The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Claims First Made Condition

The Plaintiff purchased its directors and officers liability insurance for one year periods.  The policies provided claims made coverage.  Cox Communications reported the Bondholders Action under its 2002 policy, which covered claims made from January 1, 2002 to January 1, 2003.  The policy provides that coverage is only for "Claims first made against an Insured during the Policy Period."  (Compl., Ex. A, § 1.)  The Defendant says that losses for the Bondholders Action do not satisfy this

condition.  It says that the Bondholder Action and San Mateo Actions both alleged the same breach of fiduciary duty; that the San Mateo Actions were made against the Plaintiff in May 2000; and, therefore, that the claim was first made against the Plaintiff in May 2000.

The Defendant's argument is inconsistent with the policy's definition of a claim.  The policy defines a claim as, among other things, "a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by . . . service of a complaint or similar pleading."  (Id., Ex. A, § 2(b)(1).)  This language refers to a proceeding commenced by service of a complaint.  It does not refer to the individual causes of action asserted within the complaint.  Based on this language, each new proceeding creates a new claim.  Therefore, the Bondholders Action was a claim first made in September 2002, when the Bondholders Committee filed its complaint in the District Court for the District of Delaware.

The Defendant says that this interpretation undermines the meaning of claims first made because a claim could be made more than one time if each new proceeding creates a new claim.  But that phrase still has meaning because of other provisions in the policy.  The policy provides that some claims will relate back to previous policy periods:

> If written notice of a Claim has been given to the Insurer pursuant to [the notice section's requirements], then a Claim which is subsequently made against an Insured and reported to the Insurer alleging, arising out of, based upon or attributable to the facts alleged in the Claim for which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the Claim of which such notice has been given, shall be considered related to the first Claim and made at the time such notice was given.

(Id., Ex. A, § 7(b).) For example, if the Plaintiff had provided proper notice of the San Mateo Actions in May 2000, then the Bondholders Action, which arises out of the same facts as the San Mateo Actions, would be considered related to the San Mateo Actions and made at the time notice for the San Mateo actions was given. Thus, coverage would be provided by the policy in force in the prior period. That is not what happened here. Cox Communications could not report a claim under the 2002 policy before that policy was in effect. Therefore, coverage is not excluded under the claims first made provision of the 2002 policy.

B.    Prior Notice Exclusion

The 2002 policy contains many exclusions. One exclusion is the prior notice exclusion. It provides that:

> The insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
>         . . . .
> [] alleging, arising out of, based upon or attributable to the facts alleged, or to the same or related Wrongful Acts alleged or contained in any Claim which has been reported, or in any circumstances of which notice

has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time[.]

(Compl., Ex. A, § 4(d).)  The Defendant says that losses for the Bondholders Action are subject to this exclusion.  It says that the Bondholder Actions arise out of the same facts as the San Mateo Actions; that At Home reported the San Mateo Actions to National Union in June 2000; and that Plaintiff's 2002 policy succeeds in time to At Home's 1999-2000 policy.

The key issue is whether the Plaintiff's 2002 policy succeeds in time to At Home's 1999-2000 policy, even though the Plaintiff and At Home were different companies with different policies.  Prior notice must occur "under any policy of which this policy is a renewal or replacement or which it may succeed in time."  (Id.)  The 2002 policy does not define renewal, replacement, or succeed in time, and so the Court turns to ordinary usage.  The American Heritage Dictionary defines renew as "[t]o arrange for the extension of: renew a contract"; replace as "[t]o take or fill the place of"; and succeed as "[t]o come after in time or order; follow."  <u>American Heritage Dictionary of the English Language</u> (4th Ed. 2000), http://www.thefreedictionary.com.  Based on these definitions, renewal and replacement have a limited meaning, while succeed in time has a broader meaning.  The Plaintiff's 2002 policy can only renew or replace a prior policy <u>issued to the Plaintiff</u>.  It cannot renew (which means to extend) or replace (which means to take

the place of) another company's policy. But the Plaintiff's 2002 policy can succeed in time to a policy <u>issued to any company</u>. It can succeed in time (which means to come after in time) to any policy issued to any company that ends before the Plaintiff's 2002 policy starts.

The meaning of succeed in time is ambiguous. A broader meaning would make the words renew and replace unnecessary. Every renewal or replacement policy will come after the end of some other policy. It would also make the renewal application procedure clearly unreasonable. The policy provides that, for renewal applications, "it is agreed that the Insurer has relied upon the Application as being accurate and complete in underwriting this policy." (Compl., Ex. A, § 21.) The policy defines "Application" as:

> each and every signed application, any attachments to such applications, other materials submitted therewith or incorporated therein and any other documents submitted in connection with the underwriting of this policy or the underwriting of any other directors and officers (or equivalent) liability policy issued by the Insurer, or any of its affiliates, of which this policy is a <u>renewal, replacement or which it succeeds in time</u>, and any public documents filed by an Organization with any federal, state, local or foreign regulatory agency (including but not limited to the Securities and Exchange Commission (SEC)).

(Compl., Ex. A, § 2(a)) (emphasis added). If the Plaintiff's 2002 policy succeeds in time to any policy issued to any company, then the renewal application would

incorporate documents for every policy issued to any company by the Defendant or its affiliates that ended before the 2002 policy.

Given the broad meaning of succeed in time, the rule of ejusdem generis should apply. Ejusdem generis is a rule of a construction that:

> [W]hen a statute or document enumerates by name several particular things, and concludes with a general term of enlargement, this latter term is to be construed as being [of the same kind or class] with the things specifically named, unless, of course, there is something to show that a wider sense was intended.

Department of Transp. v. Montgomery Tank Lines, Inc., 276 Ga. 105, 107 n.5 (2003); see also North Am. Specialty Ins. Co. v. Correctional Med. Servs., Inc., 527 F.3d 1033, 1037 n.2 (10th Cir. 2008) (noting that ejusdem generis has been applied to insurance contracts). Ejusdem generis is "based on the obvious reason that if it was intended that the general words should be used in their unrestricted sense, no mention would have been made of the particular classes." New Castle County v. National Union Fire Ins. Co. of Pittsburgh, PA, 243 F.3d 744, 751 (3d Cir. 2001).

Applying the rule of ejusdem generis, the Plaintiff's 2002 policy can only succeed in time to a policy previously issued to the Plaintiff. Renewal and replacement are of the same kind or class. They refer to policies previously issued to the Plaintiff. Because succeed in time is placed in a series with renewal and replacement, and because its ordinary meaning is so broad that it creates ambiguity,

succeed in time should be interpreted as being of the same kind or class. The Plaintiff's 2002 policy can only succeed in time to a policy previously issued to the Plaintiff. This interpretation allows the prior notice exclusion to reach "policies issued to [the Plaintiff] two or more years before the 2002 Cox Policy, i.e., Cox policies for which the 2002 Cox Policy would not be a 'renewal or replacement.'" (Pl.'s Opp'n to Def.'s Mot. for Summ. J., at 15 n.9.)

This interpretation of succeed in time is also consistent with general principles of insurance law. Under Georgia law, "[e]xceptions, limitations and exclusions to [an insurance policy] require a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms." Alley v. Great Am. Ins. Co., 160 Ga. App. 597, 600 (1981). And "[w]hen the language of an insurance [policy] is ambiguous and subject to more than one reasonable construction, the policy must be construed in the light most favorable to the insured, which provides him with coverage." Western Pac. Mut. Ins. Co. v. Davies, 267 Ga. App. 675, 680 (2004).

The Defendant cites to HLTH Corp. v. Clarendon National Insurance Co., C.A. No. 07C-09-102, 2009 WL 2849779 (Del. Super. Aug. 31, 2009). In HLTH, a subsidiary company reported a claim for coverage under its own insurance policy. It exhausted the limits on that policy. Later, the parent company reported a similar claim

for coverage under its own insurance policy, which had begun after the end of the subsidiary's policy. The parent's policy contained the same prior notice exclusion as the one here. The court held that the parent's losses were subject to the prior notice exclusion. It explained that "it need not consider whether the entity that gave notice [under the subsidiary's policy] was a distinct entity from [the parent] because, even if such were true, it would have no bearing on the outcome here." HLTH, 2009 WL 2849779, at *24.

But the court in HLTH did not address the broader meaning of succeed in time. It simply concluded that because the parent's policy "became effective nearly two months after the coverage period under the [subsidiary's policy] ceased, the [parent's policy] was a successor in time." Id. As set forth above, if succeed in time means simply to come after in time, it creates ambiguity. It would make the words renew and replace unnecessary, and it would make the renewal application procedure clearly unreasonable. Because the court in HLTH did not consider the broader meaning of succeed in time, its reasoning is not persuasive.

C.    Outside Entity Exclusion

The final exclusion at issue is the outside entity exclusion. The outside entity exclusion is similar to an insured versus insured exclusion, which excludes coverage

for claims brought by one insured against another insured.  The outside entity

exclusion provides that:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
>     . . . .
> [] for any Wrongful Act arising out of the Insured Person serving as an Executive of an Outside Entity if such Claim is brought by the Outside Entity or by any Executive thereof; or which is brought by any security holder of the Outside Entity, whether directly or derivatively, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the Outside Entity, any Executive of the Outside Entity of an Organization or any Executive of an Organization[.]

(Compl., Ex. A, § 4(j).)  The policy defines outside entity as any "(1) not-for-profit

entity; or (2) other entity listed as an 'Outside Entity' in an endorsement attached to

this policy." (<u>Id.</u>, Ex. A, § 2(u).)  The Outside Entity Endorsement to the 2002 policy

lists At Home as an outside entity and Woodrow as an outside entity executive.  (<u>Id.</u>,

Ex. A, Endorsement #11.)  The Defendant says that losses for the Bondholders Action

are subject to this exclusion.  It says that the Bondholders Action belonged to the At

Home estate; that it was filed in the name of and on behalf of At Home; and that,

therefore, the Bondholders Action was brought by At Home.

The Bondholders Action was brought by the Bondholders Committee, not by

At Home.  The Defendant says that these two entities are the same. But the

Defendant's argument is inconsistent with the language of the policy.  The policy

defines outside entity as any not-for-profit entity or any entity listed as an outside entity in an endorsement. It does not define outside entity to include a representative of the outside entity's estate. The parties knew how to draft for the possibility of bankruptcy but chose not to do so for the definition of outside entity. In the subsection immediately preceding the definition of outside entity, the policy defines organization as:

> (1) the Named Entity;
> (2) each Subsidiary; and
> (3) in the event a bankruptcy proceeding shall be instituted by or against the foregoing entities, the resulting debtor-in-possession (or equivalent status outside the United States), if any.

(Id., Ex. A, § 2(t).) The Defendant also knew how to draft for the possibility of representative actions but chose not to include actions brought by an estate representative. The outside entity exclusion covers derivative actions brought by shareholders of the outside entity:

> The Insurer shall not be liable to make any payment for Loss in connection with any Claim made against an Insured:
> . . . .
> [] for any Wrongful Act arising out of the Insured Person serving as an Executive of an Outside Entity if such Claim is brought by the Outside Entity or by any Executive thereof; <u>or which is brought by any security holder of the Outside Entity, whether directly or derivatively</u>, unless such security holder's Claim is instigated and continued totally independent of, and totally without the solicitation of, or assistance of, or active participation of, or intervention of the Outside Entity, any Executive of the Outside Entity of an Organization or any Executive of an Organization[.]

(Id., Ex. A, § 4(j)) (emphasis added).  The presence of these other provisions in the policy suggests that the Bondholders Committee and At Home should not be treated as the same for purposes of the outside entity exclusion.  Cf. Delta Mining Corp. v. Big Rivers Elec. Corp., 18 F.3d 1398, 1404 (7th Cir. 1994) ("[T]he parties have demonstrated elsewhere in the contract that they knew how to draft a clear contractual right to require 'makeup' deliveries.").

The Defendant's argument is also inconsistent with the principles of bankruptcy law.  Even though the Bondholders Committee filed its action on behalf of At Home's estate, bankruptcy law does not treat it and At Home as the same entity.  In In re County Seat Stores, Inc., 280 B.R. 319 (Bankr. S.D.N.Y. 2002), the court interpreted an insured versus insured exclusion similar to the outside entity exclusion here and held that a bankruptcy trustee and an insured company are separate entities.  The court explained that:

> This Court agrees with the defendant that the Trustee is asserting claims that belonged to County Seat as of the date of filing its bankruptcy petition.  However, the Court does not agree that by virtue of the trustee asserting claims that at one time belonged to the Debtor, he merely stands in the shoes of the debtor or has somehow assumed the identity of the Debtor.  In fact, any argument founded on the premise that a Trustee asserting claims founded on the rights of the Debtor assumes the identity of the Debtor exhibits the proponent's lack of understanding of the Bankruptcy Code and the statutory role and duty of a trustee appointed pursuant to the applicable sections of the Bankruptcy Code.

Id. at 324-25. The same characterization of a bankruptcy trustee applies to the Bondholders Committee here. A creditor's committee "simply enforc[es] a right belonging to the [e]state that the [d]ebtor . . . could have itself enforced." Cirka v. National Union Fire Ins. Co. of Pittsburgh, PA, Civ. A. No. 20250-NC, 2004 WL 1813283, at *7 (Del. Ch. Aug. 6, 2004).

The Defendant cites to a number of cases, almost all of which are distinguishable. See Reliance Insurance Co. of Illinois v. Weis, 148 B.R. 575, 583 (Bankr. E.D. Mo. 1992); Biltmore Associates, LLC v. Twin City Fire Insurance Co., 572 F.3d 663, 669 (9th Cir. 2009); Niemuller v. National Union Fire Insurance Co. of Pittsburgh, PA, No. 92 Civ. 0070, 1993 WL 546678, at *3 (S.D.N.Y. Dec. 30, 1993). In Reliance, the court interpreted an insured versus insured exclusion and held that, "[f]or purposes of this litigation, there is no significant legal distinction between [the insured company] and its bankruptcy estate." Reliance, 148 B.R. at 583. But the language of the exclusion in Reliance is broader than the language of the outside entity exclusion here. The exclusion in Reliance provided that:

> ([T]he Insurer shall not be liable to make any payment for loss in connection with any claim made against the Directors and Officers:) by or on behalf of a Director and/or Officer or by or on behalf of the Company, except for stockholder(s) derivative actions brought by a shareholder(s) of the Company other than a Director and/or Officer.

Id. at 578 (emphasis added).  The "or on behalf of" language can explain why the

court did not need to decide whether the committee appointed by the bankruptcy court

and the insured company were distinct entities.

In Biltmore, the court interpreted an insured versus insured exclusion and held

that exclusion applied to claims originally filed by the debtor-in-possession and then

later assigned to a trust established for its creditors.  Biltmore, 572 F.3d at 669.  But

the language of the exclusion in Biltmore is also broader than the language of the

outside entity exclusion here.  As the court explained, "[t]he only question before us

. . . is whether the underlying suit was 'brought or maintained on behalf of an Insured

in any capacity.'"  Id.  The entity that filed the claims in Biltmore is also different

from the Bondholders Committee here.  The debtor-in-possession filed the claims.

Bankruptcy law generally treats the debtor-in-possession as the same entity as the pre-

bankruptcy company.  See id. at 671 ("Applying [the bankruptcy] statutory provisions

literally, Visitalk, the debtor in possession, is the same person for bankruptcy purposes

as Visitalk, the pre-bankruptcy corporation."); In re County Seat Stores, 280 B.R. at

326.

In Niemuller, an insured company filed claims against one of its former officers

for breach of fiduciary duties.  The insured company later filed for bankruptcy

protection.  As part of an asset purchase agreement, the insured assigned its claims

against the former officer to two third party companies.  The former officer then sued

the insurer for coverage.  The court held that the insured versus insured exclusion

applied.  The court explained that it did not matter that the claims were now

maintained by the assignees instead of the insured company.  Niemuller, 1993 WL

546678, at *3.  The Defendant says that the Bondholders Committee is no different

from the assignees in Niemuller.  But the court in Niemuller recognized that there is

a difference:

> The primary and determinative distinction between the entities involved
> in [other] cases and the assignees in the instant case is that the assignees
> in the cases noted by the plaintiff are statutorily created entities charged
> by federal or state law with the obligation to pursue certain claims,
> including claims of other interested parties such as creditors.  Thus, the
> rights and claims brought by these statutory entities are not analoguous
> to those of an ordinary assignee.

Id. at *4.  The timing of the claims in Niemuller is also different from the timing here.

In Niemuller, the insured company filed its claims against the former officer before

it filed for bankruptcy protection.  Those claims were, therefore, brought by the

insured company, no matter what may have happened later.

The Defendant does cite to one case that is not readily distinguishable.  See

National Union Fire Insurance Co. of Pittsburgh, PA v. Olympia Holding Corp., No.

1:94-CV-2081, 1996 WL 33415761, at *7 (N.D. Ga. 1996).  In Olympia, the court

interpreted an insured versus insured exclusion and held that, "for purposes of this

litigation, there is no legal distinction between [the insured company] and . . . [the] Trustee for the bankruptcy estate." Id.  But the court's reasoning in Olympia is not persuasive.  The court in Olympia relied primarily on Reliance, even using similar language to describe its reasoning.  As set forth above, the exclusion in Reliance includes the phrase "by or on behalf of the Company."  Reliance, 148 B.R. at 578. This broader language is not present in the exclusion in Olympia or here.  And, without this broader language, the court in Olympia should not have concluded that there was no relevant distinction between the insured company and the trustee.  Cf. In re County Seat Stores, 280 B.R. at 328 ("This Court disagrees with . . . [Olympia] and [Reliance] and chooses instead to align itself with the reasoning of [other courts] who have ruled that insured v. insured exclusions do not apply for reasons similar to those stated in this opinion.").  The Plaintiff has shown that its losses for the Bondholders Action satisfy the claims first made condition and are not subject to either the prior notice exclusion or the outside entity exclusion.  Therefore, the Defendant is not entitled to summary judgment on the Plaintiff's claims involving the Bondholders Action.  The issues have been exhaustively briefed.  At this point in time, granting the request for oral argument would only cause further delay in ruling upon the motion.

## IV. Conclusion

For the reasons set forth above, the Court DENIES the Defendant National Union Fire Insurance Company of Pittsburgh, PA's Motion for Summary Judgment [Doc. 26] and Request for Oral Argument on Its Motion for Summary Judgment [Doc. 48].

SO ORDERED, this 9 day of April, 2010.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge